IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.                   Case 2:21-cr-20011-MSN

**ERIC BERNARD RUSSELL, JR.,**
a/k/a "Yo yo," a/k/a, "Big Bro,"

      **Defendants.**

---

**REPORT AND RECOMMENDATION ON DEFENDANT ERIC BERNARD RUSSELL JR.'S MOTION TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO SEARCH WARRANTS FOR E911 PINGS / GEOLOCATION DATA**

---

  Before the Court is Defendant Eric Bernard Russell, Jr.'s Motion to Suppress Evidence Obtained Pursuant to Search Warrants for E911 Pings / Geolocation Data. (Docket Entry ("D.E.") # 87). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. # 92). For the reasons set forth herein, it is RECOMMENDED that Russell's Motion to Suppress Evidence Obtained Pursuant to Search Warrants for E911 Pings / Geolocation Data be DENIED.

  **I.**  **Background**

    *A.*  ***Indictment and Superseding Indictment***

  On February 2, 2021, a criminal complaint was issued charging Russell and co-defendant Kevin Olando Ombisi ("Ombisi") with drug-related offenses. (D.E. #1). On February 25, 2021, a grand jury of this Court returned a ten-count indictment ("Indictment") against Russell and

Ombisi. (D.E. #8, #9). On October 28, 2021, a grand jury of this Court returned a ten-count superseding indictment ("Superseding Indictment") against Russell, Ombisi, and a third co-defendant—Winrose Wanjiru Ndichu, a/k/a "Rose," a/k/a "Shiru," a/k/a "Queen Shi" ("Ndichu"). (D.E. #53, #54, #56, #57).

The Superseding Indictment charges that Ombisi and Russell "participated in Darknet controlled substances trafficking activities using the moniker CARDINGMASTER." (*Id*. ¶ 1). It alleges that, under CARDINGMASTER, "Ombisi and Russell conspired and attempted to, and did unlawfully distribute the Schedule II controlled substance methamphetamine, which was falsely represented to be Adderall, through the mail to be delivered by the Postal Service, in the Western District of Tennessee, and elsewhere, in exchange for Bitcoin cryptocurrency." (*Id*.) It further alleges that Ombisi and Russell unlawfully enriched themselves through the unlawful distribution of controlled substances, shielded their identities through the use of the CARDINGMASTER moniker and other business entities, and concealed the receipt of proceeds through the use of pseudo-anonymous Bitcoin cryptocurrency, cash, and various business and personal accounts. (*Id*. ¶¶ 2-3).

The Superseding Indictment charges Russell with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count 1) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1) & (h) (Count 7).

### B. Ping Warrant 1

On June 3, 2020, an application for a search warrant and an affidavit ("Ping Affidavit 1") in support thereof was presented to the issuing magistrate. (D.E. #88-1 at PageID 624-637). The application requested a search warrant for information about the location of a cellular telephone with service provided by AT&T and an assigned number ending in -0078 ("Russell's Cell

2

Phone").[1]  (*Id*. at PageID 624, ¶¶ 1-2).  A search warrant designated 20-SW-165 ("Ping Warrant 1") was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of thirty days.  (*Id*. at PageID 618-623).

Ping Affidavit 1 identifies the affiant as Special Agent Paul Cox of the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI").  (*Id*. at PageID 624-25, ¶¶ 1, 4).[2]  Special Agent Cox states that the facts in Ping Affidavit 1 are based upon his personal observations, his training and experience, and information obtained from other agents and witnesses.  (*Id*. at PageID 626, ¶ 5).  He further states that the Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), and the United States Postal Inspection Service ("USPIS") were involved in this investigation.  (*Id*. at PageID 627, ¶ 8).

The investigation was initiated when law enforcement suspected that a seller or sellers with the moniker CARDINGMASTER were illegally distributing adulterated and counterfeit

---

[1]  Although Ping Affidavit 1 refers to this as the "Target Cell Phone," Russell has asserted that he is the registered owner of the telephone number ending in -0078 and continues to maintain that number.  (*See* D.E. #87 at PageID 592 n.1).  Thus, for purposes of clarity, the Court will refer to it as such.

[2]  Ping Affidavit 1 additionally details Special Agent Cox's duties, prior law enforcement experience, and training, none of which are contested here.  (*Id*. at PageID 625-26, ¶ 4).

amphetamine-based prescription drugs on a Darknet Marketplace[3] known as Empire Market and via the encrypted chat application Wickr.[4]  (*Id*.)

Beginning in November 2019, undercover agents made a total of seven purchases of a product listed as Adderall, a Schedule II controlled substance under the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq*. ("CSA"), from CARDINGMASTER without providing any prescriptions.  (*Id*. at PageID 628-29, ¶¶ 11-14).  Four or five of these purchases were made by contacting CARDINGMASTER using a Wickr screenname, and the remaining purchases were made on the Empire Market.  (*Id*. at PageID 629-30, ¶¶ 14, 16).  They were made using Bitcoin cryptocurrency and were shipped through the United States Postal Service's Priority Mail service.  (*Id*. at PageID 628-30, ¶¶ 13, 14, 16).

Following each order, a Priority Mail Small Flat Rate Box was delivered to the undercover agents at the address provided at the time of purchase.  (*Id*. ¶ 14).  The contents of these purchases appeared consistent with what was advertised for sale on the Empire Market; however, it was later

---

[3]  Ping Affidavit 1 defines the "darknet" as "a portion of the internet that is not indexed by search engines and requires special software to access."  (*Id.* at PageID 627, ¶ 10). "This specialized software includes protocols that encrypt and anonymize internet traffic both for those browsing and hosting websites on the darknet."  (*Id.* at PageID 627-28, ¶ 10)  "The use of these protocols limits the ability of governments and law enforcement to track the usage and hosting of the sites, and as a result the darknet includes a large quantity of websites that exist primarily as marketplaces for illicit substances and services, for example, narcotics and falsified identification."  (*Id.* at PageID 628, ¶ 10).

Ping Affidavit 1 explains that the term "Darknet Marketplace" refers to "commercial websites that operate on darknets like Tor."  (*Id.* at PageID 627, n.1).  It states that "Tor and other darknets are networks of computers that utilize some of the same architecture of the Internet, but which provide greater anonymity and the obfuscation of user identities."  (*Id.*)  It further states that, "[b]ecause of this anonymity, Darknet Marketplaces are commonly used to facilitate illegal transactions involving, among other things, drugs."  (*Id.*)

[4]  Ping Affidavit 1 explains that "Wickr" is "an encrypted communication application that allows individuals to communicate via text and voice."  (*Id.* at PageID 627, n.2).  It further states that "Wickr is used by individuals involved in the trafficking of counterfeit drugs because of the ability for senders of messages to set a self-destruct time for messages, as well as security features which notify senders of messages when parties to the conversation take a screenshot of messages."  (*Id.*)

determined by laboratory testing that, instead of containing the active pharmaceutical ingredient in Adderall, they contained methamphetamine, which is also a Schedule II controlled substance. (*Id*. at PageID 629, ¶¶ 14-15).

A review of the pre-printed postage found on all of the undercover purchases shows that it was purchased through a postage reseller ("Postage Reseller 1") operating under contract with USPS. (*Id*. at PageID 630, ¶ 17). A review of records obtained from Postage Reseller 1 showed that the account was under the name Frederick Bailey, that the email addresses listed were DNBACCESSORIESS@GMAIL.COM and DNBACCESSORIES@OUTLOOK.COM, and that the addresses listed were in Katy, Texas and San Antonio, Texas. (*Id*. at PageID 630, ¶ 18).

A review of records associated with Postage Reseller 1 showed that approximately 3,001 mailings had been sent using its postage. (*Id*. at PageID 630, ¶ 19). Twenty-two of these mailings were sent using postage for a Priority Mail Medium Flat Rate Box. (*Id*. ¶ 19a). Twenty of these contained the return address of D&B Accessories, LLC, 20501 Katy Fwy., 1st Floor, Suite 100E, Katy, Texas, 77449 (the "D&B Accessories Address"). (*Id*. at PageID 631, ¶ 20). All twenty of these packages were sent to an individual designated as "CC-1." (*Id*.) The address listed on twelve of the twenty packages was that of the North Broadway Post Office in San Antonio, Texas, where CC-1 was found to have a post office box (the "P.O. Box"). (*Id*. at PageID 631, ¶¶ 20, 23-24). The address listed on the remaining eight packages was that of a mailbox at UPS Store #343. (*Id*. at PageID 631, ¶¶ 20, 25-26). USPS business records showed that an Application for Delivery of Mail Through Agent was also made by Ombisi at UPS Store # 343. (*Id*. at PageID 631, ¶ 26).

Special Agent Cox summarizes that "this evidence demonstrates that the vast majority of the larger shipments are being sent from D&B Accessories, LLC in Katy, Texas to CC-1 in San Antonio, Texas." (*Id*. at PageID 631, ¶ 21). He also reiterates that this connects CC-1 as being

the recipient of at least twenty Priority Mail Medium Flat Rate Boxes bearing USPS postage purchased by an account known to be used to purchase postage for the distribution of illegal drugs, some of which were delivered to Special Agent Cox as part of the undercover investigation. (*Id*. at PageID 632, ¶ 27).

The remaining 2,979 mailings traced to Postage Reseller 1 were sent using postage for Priority Mail Small Flat Rate Boxes and Priority Mail Legal Flat Rate Envelopes. (*Id*. at PageID 630, ¶ 19b). Special Agent Cox explains that this appears to show that "whomever receives the packages in San Antonio may be dividing the larger Medium Box shipments into smaller packages to send to the purchasers." (*Id*. at PageID 631, ¶ 22).

On April 8, 2020, a search warrant was issued for an iCloud account associated with CC-1 ("CC-1's iCloud Account"). (*Id*. at PageID 632, ¶ 28). A review of the data obtained from the search of CC-1's iCloud Account indicated that CC-1 was communicating with an individual known as "Yoyo" via cellular phone about acquiring shipping supplies, creating online accounts to purchase postage, creating USPS shipping accounts in the name of fictitious accounts, and coordinating after-hours visits to USPS facilities. (*Id*. at PageID 632-33, ¶¶ 29-31). Specifically, the review discovered a photograph that was last modified on March 21, 2020 at approximately 19:57:00 and "appeared to be a screenshot of a chat communication with an individual stored within CC-1's iCloud Account under the contact name 'Yoyo.'" (*Id*. at PageID 632, ¶ 29). An excerpt of the depicted messages includes as follows:

| CC-1's iCloud Account | "need to have enough boxes on hand for 100+ orders" |
|---|---|

| "Yoyo" | "Go ahead and create a new login for usps. Make up a business name and I'll walk you through it. Give me a few business names and I'll tell you if it's good…" |
|---|---|
| "Yoyo" | "You need to hit up post offices at night cuz you know it takes damn near 2 weeks for boxes" |
| CC-1's iCloud Account | "Ok bet let me get to the house rn." |

(*Id*. at PageID 632-33, ¶ 30). Special Agent Cox states that, based upon his training and experience, he believes that this communication is "CC-1 discussing the shipping operations of a darknet drug trafficking organization with the individual identified as Yoyo" including "the procurement of shipping supplies, the creation of online accounts to be used to purchase postage, and the best times of day to go to USPS facilities in order to avoid detection by law enforcement." (*Id*. at PageID 633, ¶ 31).

The contact files stored within CC-1's iCloud Account revealed that the telephone number associated with Russell's Cell Phone was stored as "Yoyo." (*Id*. at PageID 633, ¶ 32). A review of AT&T business records indicated that this telephone number is associated with an Apple iCloud 11 Pro cellular phone that is registered to Russell with the address 5215 Royal Sunset Court, Katy, Texas 77493. (*Id*. ¶ 33).

Special Agent Cox concluded Ping Warrant 1 by summarizing as follows: (1) that postage records indicate that the illegal substances at issue are suspected of originating in Katy, Texas being sent to CC-1 in San Antonio, Texas and then being further distributed to customers from San Antonio; (2) that Russell, who appears to be located at Katy, Texas, is working with CC-1, who resides in San Antonio, to distribute the illegal substances; and, (3) that Russell and CC-1 appear to be strategizing about how to create fake businesses and utilize USPS in order to distribute

the illegal substances. (*Id*. at PageID 633, ¶ 34). Thus, Special Agent Cox asserted that there is probable cause that Russell's Cell Phone will yield evidence related to the distribution of illegal substances using the USPS, including "whether he spends time physically in the same location as CC-1, whether he is mailing packages to CC-1, the other locations he visits in and around the time he meets with CC-1 or may be mailing packages, other people with whom he may be in contact, and other such information related to the investigation. (*Id*. at PageID 633-34, ¶ 34).[5]

### C. Ping Warrant 2

On July 2, 2020, an application for a second search warrant and an affidavit ("Ping Affidavit 2") in support thereof was presented to the issuing magistrate. (D.E. #88-2). Ping Affidavit 2 identifies the affiant as Special Agent Cox. (*Id*. at PageID 641). A search warrant designated 20-SW-186 ("Ping Warrant 2") was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of forty-five days. (*Id*. at PageID 639-40, 658-61).

Ping Warrant 2 relies upon evidence discovered as a result of Ping Warrant 1 (D.E. #88-1 at PageID 627-34, ¶¶ 8-34; *Id*. at PageID 644-51, ¶¶ 9-35); however, it also includes new evidence from authorized search of location information for the telephone number associated with CC-1's iCloud Account. (*Id*. at PageID 651-53, ¶¶ 36-43). Specifically, a review of the location information for Russell's Cell Phone and CC-1's cell phone indicated that the devices were located at the Katy Mills Mall just outside Houston, Texas within three minutes of one another. (*Id*. at PageID 652, ¶¶ 37-39). Additionally, a review of the location information for Russell's Cell Phone indicated that he was in the Houston area on June 16, 2020. (*Id*. at PageID 652, ¶ 42). Undercover

---

[5] Ping Affidavit 1 further sets forth the additional information that would be available from AT&T regarding the location of Russell's Cell Phone. (*Id*. at PageID 634-35, ¶¶ 35-27; *see also* PageID 624-25, ¶¶ 2-3).

8

agents made a purchase of a product listed as Adderall from CARDINGMASTER on that same date. (*Id*. ¶ 40). A review of USPS business records showed that a parcel bearing the undercover name and address entered the mail stream in North Houston, Texas on June 17, 2020. (*Id*. ¶ 41).

Special Agent Cox added that, based upon his training and experience, "individuals involved in the distribution of illegal substances through the United States Postal Service will, at times, . . . relocate operations from one city to another in an effort to conceal illegal activity from law enforcement, particularly when distributing a large number of parcels over an extended period of time, in order to conceal their illegal activity from law enforcement." (*Id*. at PageID 652-53, ¶ 43).

### D. Ping Warrant 3

On August 12, 2020, an application for a third search warrant and an affidavit ("Ping Affidavit 3") in support thereof was presented to the issuing magistrate. (D.E. #88-3). Ping Warrant 3 identifies the affiant as Special Agent Cox. (*Id*. at PageID 669). A search warrant designated 20-SW-219 was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of forty-five days. (*Id*. at PageID 663-668).

Ping Warrant 3 largely relies upon the same facts as Ping Warrant 2 and did not include any new evidence directly pertaining to Russell (*See* D.E. #88-2 at PageID 644-653, ¶¶ 9-43; D.E. #88-3 at PageID 672-681, ¶¶ 9-43); however, it does contain new evidence pertaining to Ombisi. (D.E. #88-3 at PageID 681-82, ¶¶ 45-46).[6] Specifically, on July 9, 2020, USPIS inspectors and other law enforcement offices observed Ombisi enter the Fleetwood Post Office in Houston, Texas

---

[6] Although Ping Warrants 1 and 2 and the earlier portions of Ping Warrant 3 only refer to another individual involved as CC-1, this portion of Ping Warrant 3 identifies an individual by the name of Kevin Ombisi. (*See* D.E. #88-1, #88-2, #88-3). Paragraphs 45 and 46 of Ping Warrants 4, 5, 6, and 7 return to referring to Ombisi as CC-1. (*See* D.E. #88-4, #88-4, #88-6, #88-7). The Court will include the information exactly as it was contained in Ping Warrant 3, as that is the information that was presented to the issuing magistrate.

and deposit "numerous parcels consistent with the size, shape, and color of USPS Small Flat Rate boxes from the bag into the mail stream." (*Id*. at PageID 681, ¶ 45). A subsequent review of the collection bin into which the parcels were deposited revealed eleven small flat rate boxes bearing the D&B Accessories Address. (*Id*.) On July 13, 2020, a search warrant was issued for one of the parcels (the "Fleetwood Parcel"), and the subsequent search thereof discovered "numerous tablets" consistent in size, color, and tablet imprint as those previously received in the undercover purchases. (*Id*. at PageID 682, ¶ 46).

### E. Ping Warrant 4

On September 23, 2020, an application for a search warrant and an affidavit ("Ping Affidavit 4") in support thereof was presented to the issuing magistrate. (D.E. #88-4). Ping Affidavit 3 identifies the affiant as Special Agent Cox. (*Id*. at PageID 693). A search warrant designated 20-SW-263 ("Ping Warrant 3") was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of forty-five days. (*Id*. at PageID 693-711).

Ping Affidavit 4 largely relies upon the same facts as Ping Affidavit 3 (*See* D.E. #88-3 at PageID 672-681, ¶¶ 9-46; D.E. # 88-4 at PageID 696-706, ¶¶ 9-46); however, Ping Affidavit 4 includes details four new occasions—on August 21, 2020, August 28, 2020, August 29, 2020, and August 31, 2020, where CC-1 deposited USPS Priority Mail small flat rate boxes consistent with the packaging he is known to use to distribute counterfeit Adderall tablets at the Katy Post Office and Fleetwood Post Offices. (D.E. #88-4 at PageID 706-709, ¶¶ 48-57). Certain evidence regarding these occurrences came from authorized GPS tracking data from a vehicle ("CC-1's Jetta") "known to be utilized by CC-1 for the distribution of illegal substances using the USPS." (*Id*. at PageID 706-708, ¶¶ 48-49, 51, 53, 56). On August 29, 2020, surveillance footage showed that CC-1 appeared to be using a cellular phone while depositing the parcels. (*Id*. at PageID 708,

¶ 54). A review of T-Mobile business records associated with a cellular phone known to be used by CC-1 revealed that the call was between CC-1 and Russell's Cell Phone. (*Id*. at PageID 708, ¶ 55).

### F. Ping Warrant 5

On November 6, 2020, an application for a search warrant and an affidavit ("Ping Affidavit 5") in support thereof was presented to the issuing magistrate. (D.E. #88-5). Ping Affidavit 5 identifies the affiant as Special Agent Cox. (*Id*. at PageID 719). A search warrant designated 20-SW-326 ("Ping Warrant 5") was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of forty-five days. (*Id*. at PageID 713-18).

Ping Affidavit 5 largely relies upon the same facts as Ping Affidavit 4 (*see* D.E. #88-4 at PageID 696-709, ¶¶ 9-57; D.E. #88-5 at PageID 722-34, ¶¶ 9-57); however, Ping Affidavit 5 includes new evidence relating to CC-1 (*see* D.E. 88-5 at PageID 735-36, ¶¶ 59-62). Specifically, GPS tracking data indicated that, on October 20, 2020, CC-1's Jetta was located in the vicinity of the Weslayan Station Post Office. (*Id*. at PageID 732, ¶ 48 & PageID 735, ¶ 59). A review of surveillance footage for the Weslayan Station Post Office at the time CC-1's Jetta was believed to be nearby showed an individual matching the description of CC-1 walk to the parcel drop bin and place multiple parcels into it and then depart. (*Id*. at PageID 735, ¶ 60). Shortly thereafter, investigators from FDA-OCI and USPIS accessed the parcel bin and observed four USPS Priority Mail small flat rate boxes bearing a similar address to the D&B Accessories Address[7] that were consistent with the packaging CC-1 is known to use to distribute counterfeit Adderall tablets. (*Id*. at PageID 735, ¶ 61). A subsequent review of records from Postage Reseller 1, which was used

---

[7] The D&B Accessories Address lists the suite number as 100E and zip code as 77449; this address listed the suite number as 201 and the zip code as 77450. (*Id*. at PageID 735, ¶ 61).

to purchase the postage on the undercover purchases, was used to purchase the postage on two of these four parcels and was also used to purchase a combined total of seventeen pieces of postage to these two addresses between September 26, 2019 and January 17, 2020. (*Id*. at PageID 735-36, ¶ 62).

### G.  Ping Warrant 6

On December 18, 2020, an application for a search warrant and an affidavit ("Ping Affidavit 6") in support thereof was presented to the issuing magistrate. (D.E. #88-6). Ping Affidavit 6 lists Special Agent Cox as the affiant. (*Id*. at PageID 747). A search warrant designated 20-SW-366 ("Ping Warrant 6") was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of forty-five days. (*Id*. at PageID 741-746).

Ping Affidavit 6 largely relies upon the same facts as Ping Affidavit 5 (*see* D.E. #88-5 at PageID 722-36, ¶¶ 9-62; D.E. #88-6 at PageID 750-64, ¶¶ 9-62); however, Ping Affidavit 6 sets forth the details of two additional undercover purchases from CARDINGMASTER as well as telephone records of call activity between Russell and CC-1. (*Id*. at PageID 764-65, ¶¶ 64-69).

Specifically, on December 4, 2020, undercover agents ordered a product listed as Adderall from CARDINGMASTER. (*Id*. at PageID 764, ¶ 64). Later that day, a parcel bearing the undercover name and address entered the mail stream at the Alameda Station post office in Houston, Texas. (*Id*. ¶ 65). A review of GPS tracking data related to CC-1's Jetta indicates that he was in the vicinity at approximately the same time. (*Id*. ¶ 66).

On December 10, 2020, undercover agents again ordered a product listed as Adderall from CARDINGMASTER. (*Id*. at PageID 764-65, ¶ 67). Agents conducting physical and electronic surveillance of CC-1 on that date observed him enter the Alameda Station post office and deposit multiple parcels into the mail stream. (*Id*. at PageID 765, ¶ 68). Agents and Inspectors

subsequently photographed the labels of seven parcels deposited by CC-1 and observed that one was addressed to the undercover address. (*Id*.)  A search of this parcel "revealed numerous tablets consistent with the undercover [purchases] . . . and of the same size, color, and tablet markings received during previous undercover purchases . . . ." (*Id*.)  A field test indicated that these tablets also contained a detectable amount of methamphetamine. (*Id*.)

Additionally, AT&T business records showed that CC-1 and Russell were in communication in the weeks prior to these shipments.  Specifically, from November 12, 2020 until November 26, 2020, there were nineteen telephone calls between the two individuals. (*Id*. ¶ 69).

### H.  Ping Warrant 7

On January 28, 2021, an application for a search warrant and an affidavit ("Ping Affidavit 7)" in support thereof was presented to the issuing magistrate. (D.E. #88-7).  Special Agent Cox is listed as the affiant. (*Id*. at PageID 776).  A search warrant designated 21-SW-051 ("Ping Warrant 7") was subsequently issued authorizing law enforcement to obtain the information detailed therein for a period of fifteen days. (*Id*. at PageID 770-75).

Ping Affidavit 7 relies upon information from Ping Affidavit 6 (*see* D.E. #88-6 at PageID 750-64, ¶¶ 9-69; D.E. #88-7 at PageID 779-94, ¶¶ 9-69), but it also includes extensive new evidence as well (*see* D.E. #88-7 at PageID 798-801, ¶¶ 71-106).  The bulk of the new information pertains to drug trafficking activity relating to CC-1 (*Id*. ¶¶ 105-106), surveillance of CC-1 (*Id*. ¶¶ 71-72, 96-97, 103-104), and shipping activities involving CC-1 (*Id*. ¶¶ 73-76, 92-95, 98-99); however, Ping Affidavit 7 does contain evidence directly pertaining to Russell and his cellular telephone. (*Id*. ¶¶ 77-91, 100-102).

Specifically, Ping Affidavit 7 details that GPS tracking data and cellular phone location data suggests that, on the morning and early afternoon of January 7, 2021, CC-1 visited the

following locations: (1) two locations where investigators have observed CC-1 depart with parcels that were later found to contain counterfeit drugs containing methamphetamine; (2) the Alameda Station post office; and, (3) a Wells Fargo bank in Katy, Texas. (*Id*. at PageID 796-97, ¶¶ 77-84). Later that afternoon, at approximately 15:25, GPS tracking information indicated that CC-1's Jetta was located in the vicinity of a playground approximately five hundred feet to the west of Russell's residence. (*Id*. at PageID 797, ¶ 86). At that same time, video surveillance near Russell's residence showed that a vehicle matching the description of one registered to him departed the residence. (*Id*. at PageID 797-98, ¶ 87). At approximately 15:37, GPS tracking information indicated that CC-1's Jetta was departing the playground. (*Id*. at PageID 798, ¶ 88). At that same time, location information related to Russell's Cell Phone indicated that it was approximately 290 feet to the south of Russell's residence and approximately 400 feet southeast of the playground. (*Id*. ¶ 89). At approximately 15:39, video surveillance near Russell's residence revealed that the vehicle matching the description of the one registered to him returned and parked in the garage. (*Id*. ¶ 90). At approximately 15:53, location information related to Russell's Cell Phone indicated that the device was located in the vicinity of his residence with an accuracy radius of less than 600 meters. (*Id*. ¶ 91).

Ping Affidavit 7 further details that, on January 23, 2021, Russell's Cell Phone received one call from CC-1 and placed two calls to CC-1. (*Id*. at PageID 800, ¶¶ 100-102).

## II. Analysis

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. When presented with an application for a search warrant, the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citation omitted) (explaining that "[s]earch warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny").

Although reasonable minds may frequently differ on the question of whether the affidavit establishes probable cause, reviewing courts should afford the issuing magistrate's determination "great deference," *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted), and "an issuing magistrate's decision should only be reversed if it was arbitrarily exercised," *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)).

Russell raises two specific challenges to the issuance of Ping Warrants 1-7. First, Russell asserts that there is not a sufficient nexus between his cell phone location data and the investigation into "Ombisi's drug activity."[8] Second, he argues that Ping Warrants 3-7 rely almost exclusively upon stale information.

As to the first challenge, Russell relies upon *United States v. Sheckles*, 996 F.3d 330 (6th Cir. 2021), which raised, but did not answer, a question as to the type of nexus required to obtain

---

[8] It is important to note that, while the majority of the evidence contained in the Ping Affidavits pertains to CC-1 or Ombisi, and while Russell's filings in this case distance himself from Ombisi's conduct, Russell has not argued herein that evidence adduced against CC-1 or Ombisi could not provide probable cause for Ping Warrants 1-7.

a warrant for cellular phone location data. The *Sheckles* court began by stating that, to search a physical location, law enforcement needs "a probable-cause 'nexus' showing a fair probability that the home to be searched will contain the things to be seized." *Id*. at 338. (citations omitted). The *Sheckles* court then noted that a warrant for cellular phone location data is not being used to seize anything but instead to investigate the person's crimes. *Id*. Given this distinction, the *Sheckles* court asked, "[m]ust the affidavit show only a fair probability that the phone's data 'will aid in a particular' investigation and disclose evidence of criminal activity? Or must it show, say, a fair probability that the phone itself is being used 'in connection with criminal activity'?" *Id*. (internal citations omitted). The *Sheckles* court, however, did not need to resolve the question because the warrant challenged therein satisfied either standard. *Id*.

Here, although Russell has restated the question presented in *Sheckles*, he only generally alleges that Ping Affidavits 1-7 do not contain probable cause. Regardless of what degree of nexus is arguably required, Russell does not articulate any specifics of how the nexus requirements have not been met. Accordingly, it is RECOMMENDED that the issuing magistrate did not arbitrarily conclude that Ping Affidavits 1-7 satisfy the nexus requirement of the probable cause inquiry.[9]

As to the second challenge, Russell relies upon *United States v. Paull*, 551 F.3d 516 (6th Cir. 2009) and *United States v. Brooks*, 594 F.3d 488 (6th Cir. 2010), for his position that Ping Affidavits 3-7 relied upon information that was too stale to establish probable cause. In *Paull*, the Sixth Circuit similarly states that an affidavit must allege "facts so closely related to the time of

---

[9] Furthermore, the Sixth Circuit has recently provided more significant guidance on the question raised in *Sheckles*. In *United States v. Jeremie Scott Ennis*, No. 21-1093, 2022 WL 976930, (6th Cir. Mar. 31, 2022), the defendant asked the Court to apply the higher standard articulated therein. *Id*. at *2-*3. The *Ennis* court declined to do so and stated that, "by leaving the question open, *Sheckles* declined to alter the probable cause standard: Thus, the traditional 'nexus' standard remains good law." *Id*. Thus, if Russell contends that Ping Affidavits 1-7 would have to show that the phone itself was being used in connection with criminal activity, the Sixth Circuit has now resolved that this is not the case.

the issue of the warrant as to justify a finding of probable cause at that time." 551 F.3d at 522 (*Sgro v. United States*, 287 U.S. 206, 210 (1932)). In *Brooks*, the Sixth Circuit stated that, while "the affidavit may not employ 'stale' information," whether information is in fact stale depends upon the "'inherent nature of the crime.'" *Brooks*, 594 F. 3d at 493 (quoting *United States v. Spikes*, 158 F.3d 913, 923) (6th Cir. 1998)). It further states that the staleness inquiry depends upon several other factors, such as the character of the crime, the criminal, any items to be seized, and the place to be searched. *Brooks*, 594 F.3d at 493 (quoting *United States v. Hammond*, 351 F.3d 765, 771-72 (6th Cir. 2003)).

Upon review, the information contained in Ping Affidavits 3-7 was obtained between five and thirty-six days before the applications for search warrants were presented. The character of the crime under investigation is an ongoing narcotics distribution conspiracy, which sets a higher bar for evidence to be considered stale. *See Brooks*, 594 F.3d at 493; *see also United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) ("The passage of time becomes less significant when the crime at issue is ongoing or continuous. . . .").

As to the specific length of time between when the evidence was obtained and the applications for search warrants were presented, there is no "arbitrary time limitation within which discovered facts must be presented to a magistrate." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001). However, the Sixth Circuit has concluded that evidence of drug distribution that was obtained roughly one month from the time the warrant was sought or executed is not stale. *See Greene*, 250 F.3d at 481 (finding that the evidence was not stale it showed that the narcotics trafficking was continuous and ongoing and a drug shipment was sent less than one month prior to the execution of the warrant). Other district courts within the Sixth Circuit have reached similar conclusions. *See, e.g., United States v. Meeks*, No. 10-CR-20388, 2010 WL 4136038, at *6-*7

(E.D. Mich. Oct. 15, 2010) (concluding that, in light of the ongoing nature of the drug distribution conspiracy, the two-month-old confidential informant's tip was not stale).

Furthermore, evidence of drug distribution that was acquired a significantly longer period of time before the presentation of an application for a search warrant has been found not to be stale. *See, e.g., United States v. Powell*, 603 Fed. Appx. 475, 478 (6th Cir. 2015) (concluding that, despite the "eight-month time lag, the affidavit was not sufficiently stale to vitiate the minimally sufficient nexus" to obtain a search warrant relating to a "continuing drug ring"); *United States v. Word*, 806 F.2d 658, 662 (6th Cir. 1986) (concluding that four-to-five-month-old information was not stale when the affidavit alleged illegal drug distribution offenses of a continuing nature). Accordingly, it is RECOMMENDED that the issuing magistrate did not rely upon stale information and, thus, did not arbitrarily conclude that Ping Affidavits 3-7 were based upon probable cause.

### III.  Conclusion

For the reasons set forth herein, it is RECOMMENDED that Russell's Motion to Suppress Evidence Obtained Pursuant to Search Warrants for E911 Pings / Geolocation Data (D.E. #87) be DENIED.

**SIGNED** this 22nd day of April, 2022.

> s/ Charmiane G. Claxton
> CHARMIANE G. CLAXTON
> UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**