IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                                      Case 2:21-cr-20011-MSN

ERIC BERNARD RUSSELL, JR.,
a/k/a "Yo yo," a/k/a, "Big Bro,"

                Defendants.

REPORT AND RECOMMENDATION ON DEFENDANT ERIC BERNARD RUSSELL,
JR.'s MOTION TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO SEARCH
WARRANTS FOR APPLE iCLOUD RECORDS

Before the Court is Defendant Eric Bernard Russell, Jr.'s ("Russell") Motion to Suppress Evidence Obtained Pursuant to Search Warrants for Apple iCloud Records. (Docket Entry ("D.E.") # 89). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #92).

For the reasons set forth herein, it is RECOMMENDED that Russell's motion to suppress the evidence obtained in the first search of his Apple iCloud Account pursuant to the search warrant designated 20-SW-152 be DENIED and that Russell's motion to suppress the evidence obtained in the second search of his Apple iCloud Account pursuant to the search warrant designated 20-SW-273 be GRANTED.

I.      **Background**

   A.      *Indictment and Superseding Indictment*

On February 2, 2021, a criminal complaint was issued charging Russell and co-defendant Kevin Olando Ombisi ("Ombisi") with drug-related offenses. (D.E. #1). On February 25, 2021, a grand jury of this Court returned a ten-count indictment ("Indictment") against Russell and Ombisi. (D.E. #8, #9). On October 28, 2021, a grand jury of this Court returned a ten-count superseding indictment ("Superseding Indictment") against Russell, Ombisi, and a third co-defendant—Winrose Wanjiru Ndichu, a/k/a "Rose," a/k/a "Shiru," a/k/a "Queen Shi" ("Ndichu"). (D.E. #53, #54, #56, #57).

The Superseding Indictment charges that Ombisi and Russell "participated in Darknet controlled substances trafficking activities using the moniker CARDINGMASTER." (*Id.* ¶ 1). It alleges that, under CARDINGMASTER, Russell and Ombisi "conspired and attempted to, and did unlawfully distribute the Schedule II controlled substance methamphetamine, which was falsely represented to be Adderall, through the mail to be delivered by the Postal Service, in the Western District of Tennessee, and elsewhere, in exchange for Bitcoin cryptocurrency." (*Id.*) It further alleges that Russell and Ombisi unlawfully enriched themselves through the unlawful distribution of controlled substances, shielded their identities through the use of the CARDINGMASTER moniker and other business entities, and concealed the receipt of proceeds through the use of pseudo-anonymous Bitcoin cryptocurrency, cash, and various business and personal accounts. (*Id.* ¶¶ 2-3).

The Superseding Indictment charges Russell with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 1) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 7).

### B.  *Search Warrant 20-SW-152*

On May 27, 2020, an application for a search warrant and an affidavit ("Affidavit 1") in support thereof was presented to the issuing magistrate.  (D.E. #90 at PageID 825-843).  The place to be searched was an iCloud Account associated with Russell ("Russell's iCloud Account").[1]  (*Id*. at PageID 825).  A search warrant designated 20-SW-152 (the "First Search Warrant") was subsequently issued by this Court.  (*Id*. at PageID 816-24).

Affidavit 1 identifies the affiant as Special Agent Paul Cox of the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI").[2]  (*Id.* at PageID 825).  Special Agent Cox states that the facts in Affidavit 1 are based upon his personal observations, his training and experience, and information obtained from other agents and witnesses.  (*Id*. at PageID 826, ¶ 3).  He further states that the Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), and the United States Postal Inspection Service ("USPIS") were involved in this investigation.  (*Id*. at PageID 827, ¶ 6).

The investigation was initiated when law enforcement suspected that a seller or sellers with the moniker CARDINGMASTER were illegally distributing adulterated and counterfeit

---

[1]  Affidavit 1 refers to Russell's iCloud Account as the "Target iCloud Account"; however, because Russell has not denied that it was his iCloud Account, the Court will refer to it as his in this Report and Recommendation for purposes of clarity.  *See also*, *infra*, n.5.

[2]  Affidavit 1 additionally details Special Agent Cox's duties, prior law enforcement experience, and training, none of which are contested here.  (*Id*. at PageID 825-26, ¶ 2).

amphetamine-based prescription drugs on a Darknet Marketplace[3] known as Empire Market and via the encrypted chat application Wickr.[4] (*Id*. at PageID 827, ¶ 6).

Beginning in November 2019, undercover agents made seven purchases of a product listed as Adderall, a Schedule II controlled substance under the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq*. ("CSA"), from CARDINGMASTER without providing any prescriptions. (*Id*. at PageID 829-30, ¶¶ 9-12). Five of these purchases were made by contacting CARDINGMASTER using a Wickr screenname, and the remaining purchases were made on the Empire Market. (*Id.* at PageID 830-31, ¶¶ 12, 14). They were made using Bitcoin cryptocurrency and were shipped through the United States Postal Service's ("USPS") Priority Mail service. (*Id*. at PageID 829-31, ¶¶ 11, 12, 14).

Following each order, a Priority Mail Small Flat Rate Box was delivered to the undercover agents at the address provided at the time of purchase. (*Id*. ¶ 12). The contents of these purchases appeared consistent with what was advertised for sale on the Empire Market;

---

[3] Affidavit 1 defines the "darknet" as "a portion of the internet that is not indexed by search engines and requires special software to access." (*Id.* at PageID 828, ¶ 8). "This specialized software includes protocols that encrypt and anonymize internet traffic both for those browsing and hosting websites on the darknet." (*Id.*) "The use of these protocols limits the ability of governments and law enforcement to track the usage and hosting of the sites, and as a result the darknet includes a large quantity of websites that exist primarily as marketplaces for illicit substances and services, for example, narcotics and falsified identification." (*Id.* at PageID 828-29, ¶ 8).

Affidavit 1 explains that the term "Darknet Marketplace" refers to "commercial websites that operate on darknets like Tor." (*Id.* at PageID 828 n.1). It states that "Tor and other darknets are networks of computers that utilize some of the same architecture of the Internet, but which provide greater anonymity and the obfuscation of user identities." (*Id.*) It further states that, "[b]ecause of this anonymity, Darknet Marketplaces are commonly used to facilitate illegal transactions involving, among other things, drugs." (*Id.*) One example of a Darknet Marketplace is Empire Market, "on which one can find a variety of illicit drugs and services available for purchase from vendors throughout the world." (*Id.*)

[4] Affidavit 1 explains that "Wickr" is an "encrypted communication application that allows individuals to communicate via text and voice." (*Id.* at PageID 828 n.2). It further states that "Wickr is used by individuals involved in the trafficking of counterfeit drugs because of the ability for senders of messages to set a self-destruct time for messages, as well as security features which notify senders of messages when parties to the conversation take a screenshot of messages." (*Id.*)

however, it was later determined by laboratory testing that, instead of containing the active pharmaceutical ingredient in Adderall, they contained methamphetamine, which is also a Schedule II controlled substance. (*Id*. at PageID 830, ¶¶ 12-13).

A review of the pre-printed postage found on all of the undercover purchases shows that it was purchased through a postage reseller ("Postage Reseller 1") operating under contract with USPS. (*Id*. at PageID 831, ¶ 15). A review of records obtained from Postage Reseller 1 showed that the account was under the name Frederick Bailey, that the email addresses listed were DNBACCESSORIESS@GMAIL.COM and DNBACCESSORIES@OUTLOOK.COM, and that the addresses listed were in Katy, Texas and San Antonio, Texas. (*Id*. at PageID 831, ¶ 16).

A review of records associated with Postage Reseller 1 showed that approximately 3,001 mailings had been sent using its postage. (*Id*. at PageID 831, ¶ 17). Twenty-two of these mailings were sent using postage for a Priority Mail Medium Flat Rate Box. (*Id*. ¶ 17a). Twenty of these were sent to an individual designated CC-1 and contained the return address of D&B Accessories, LLC, 20501 Katy Fwy., 1st Floor, Suite 100E, Katy, Texas, 77449 (the "D&B Accessories Address"). (*Id*. at PageID 832, ¶ 18). The address listed on twelve of the twenty packages was that of the North Broadway Post Office in San Antonio, Texas, where CC-1 was found to have a post office box (the "P.O. Box"). (*Id*. at PageID 832, ¶¶ 18, 21-22). The address listed on the remaining eight packages was that of a mailbox at UPS Store #343. (*Id*. at PageID 832-33, ¶¶ 18, 23-24). USPS records showed that an Application for Delivery of Mail Through Agent was also made for CC-1 at UPS Store # 343. (*Id*. at PageID 833, ¶ 24).

Special Agent Cox summarizes that "this evidence demonstrates that the vast majority of the larger shipments are being sent from D&B Accessories, LLC in Katy, Texas to CC-1 in San

Antonio, Texas." (*Id*. at PageID 832, ¶ 19).  He also reiterates that this connects CC-1 as being the recipient of at least twenty pieces of mail bearing USPS postage purchased by an account known to be used to purchase postage for the distribution of illegal drugs, some of which were delivered to Special Agent Cox as part of the undercover investigation. (*Id*. at PageID 833, ¶ 25).

The remaining 2,979 mailings traced to Postage Reseller 1 were sent using postage for Priority Mail Small Flat Rate Boxes and Priority Mail Legal Flat Rate Envelopes. (*Id*. at PageID 831, ¶ 17b).  Special Agent Cox explains that this appears to show that "whomever receives the packages in San Antonio may be dividing the larger Medium Box shipments into smaller packages to send to the purchasers." (*Id*. at PageID 832, ¶ 20).

On April 8, 2020, a search warrant was issued for an iCloud account associated with CC-1 ("CC-1's iCloud Account"). (*Id*. at PageID 833, ¶ 26).  A review of the data obtained from the search of CC-1's iCloud Account indicated that CC-1 was communicating with an individual known as "Yoyo" via cellular phone about "procuring shipping supplies, generating accounts necessary to produce postage, and the depositing of parcels into the USPS mail stream." (*Id*. at PageID 833, ¶¶ 27-32).  Specifically, the review discovered a photograph that was last modified on March 20, 2020 at approximately 19:57:00 and "appeared to be a screenshot of a chat communication with an individual stored within CC-1's iCloud Account under the contact name 'Yoyo.'" (*Id*. ¶ 28).  An excerpt of the depicted messages includes as follows:

| CC-1's iCloud Account | "need to have enough boxes on hand for 100+ orders" |
|---|---|

| | |
|---|---|
| "Yoyo" | "Go ahead and create a new login for usps. Make up a business name and I'll walk you through it. Give me a few business names and I'll tell you if it's good…" |
| "Yoyo" | "You need to hit up post offices at night cuz you know it takes damn near 2 weeks for boxes" |
| CC-1's iCloud Account | "Ok bet let me get to the house rn." |

(*Id*. at PageID 834, ¶ 31). Special Agent Cox states that, based upon his training and experience, he believes that this communication is "CC-1 discussing the shipping operations of a darknet drug trafficking organization with the individual identified as Yoyo" including "the procurement of shipping supplies, the creation of online accounts to be used to purchase postage, and the best times of day to go to USPS facilities in order to avoid detection by law enforcement." (*Id*. ¶ 32).

The contact files stored within CC-1's iCloud Account revealed a contact stored under the name "Yoyo" with a telephone number ending in -0078. (*Id*. ¶ 29). A review of AT&T business records indicated that this telephone number is associated with an Apple iCloud 11 Pro cellular telephone that is registered to Russell with the address 5215 Royal Sunset Court, Katy, Texas 77493. (*Id*. ¶¶ 30, 33). Special Agent Cox states that "Apple iPhone users are encouraged to configure an iCloud account, which allows full access to Apple services, and also serves as a backup for the data contained on an iPhone." (*Id*. at PageID 835, ¶ 33).

Agents then proceeded to review USPS business records, which indicated that, on March 20, 2020, at approximately 21:14, a USPS Click 'n' Ship Account (the "Click 'n' Ship Account") was registered in the name of "DNB ACCESSORIES" with a similar San Antonio, Texas return address as was found on undercover purchases from CARDINGMASTER that were received by

law enforcement.  (*Id*. at PageID 835, ¶ 34).  Upon further review of the USPS business records related to the Click 'n' Ship Account, agents discovered that postage for 353 mailings was generated between April 7, 2020 and April 18, 2020.  (*Id*. ¶ 34).  Of those 353 pieces of postage, three were addressed to Ombisi at UPS Store #343 with the DNB Accessories Address as the return address.  (*Id*. at PageID 835-36, ¶ 34).

Affidavit 1 further sets forth additional evidence that would be available from iCloud accounts in general, including Russell's iCloud Account.  (*Id*. at PageID 836, ¶¶ 35-48).

### C.  Search Warrant 20-SW-273

On September 30, 2020, an application for a second search warrant and an affidavit ("Affidavit 2") in support thereof was presented to the issuing magistrate.  (D.E. #90-1).  Affidavit 2 identifies the affiant as Special Agent Cox.  (*Id*. at PageID 854).  Along with other proposed searches, this application sought to search Russell's iCloud Account for a second time.[5]  (*Id*. ¶ 1).  A search warrant designated 20-SW-273 (the "Second Search Warrant") was subsequently issued by this Court.  (*Id*. at PageID 845-853).

Affidavit 2 relies upon evidence discovered in the first search of Russell's iCloud Account pursuant to the First Search Warrant.  (*Id*. at PageID 865-66, ¶¶ 35-37).  Specifically, the search revealed that Russell and an individual ("AS") exchanged thirty text messages on the evening of April 6, 2018 about procuring prescription drugs and controlled substances.  (*Id*. ¶ 37).[6]

---

[5]  Russell's iCloud Account is designated as "Target iCloud Account-2" in Affidavit 2 (*Id*. at PageID 854, ¶ 1); however, the Court will continue to refer to it as "Russell's iCloud Account" for purposes of this Report and Recommendation, *see*, *supra*, n.1.

[6]  Affidavit 2 lists the communications as being between Russell's iCloud Account and Target iCloud Account-3, which Affidavit 2 sets forth is associated with AS (*Id*. ¶ 37 & PageID 866-67, ¶ 38); however,

8

The conversation with Russell and AS begins with Russell saying that he "found the bag of meds people return" and "they aren't logged at all." (*Id*.) AS responds by stating that she needs two or five "xans"—"5 if it's a lot" or "2 if it's not." (*Id*.) Russell asked, "[w]ould alprazolam work? Or it has to be name brand?" (*Id*.) AS responded that it did not matter because they are the same and that Russell should "take whatever isn't noticeable" but "[n]othing that'll get you in trouble." (*Id*.) Russell responded, "[l]et me wait until everyone's gone then I'll check it out." (*Id*.) He also stated, "I don't know what's in [the bag]" but that it was inside a desk. (*Id*.) AS replied, "[i]f it's a bottle that's cool, if it's just a few pills that's cool too. Nothing too obvious." (*Id*.) Russell then stated that he only found bupropion, clonazepam, and "off brand" Adderall. (*Id*.) AS told him that she did not need any of those. (*Id*.) Russell stated that there was "one more in a paper bag staples [sic] closed" but that he did not "know how to get in it without being suspicious and showing someone went in it." (*Id*.) AS responded that it was "not worth it" and not to "mess with it." (*Id*.) AS told him that her own "order" was "coming in a week hopefully." (*Id*.) Russell acknowledged this but stated that he wanted to help anyway. (*Id*.) He also asked, "[h]ow [sic] your girl work for a psychiatrist but you can't get meds[?]" (*Id*.) Special Agent Cox acknowledges that, despite the conversation, "it appears that the discussed acquisition of prescription drugs and controlled substances was not carried out." (*Id*.)

Affidavit 2 further details that three instances where GPS tracking information and surveillance footage shows Ombisi mailing small flat rate boxes consistent with the packaging he uses to distribute counterfeit Adderall. (*Id* at PageID 867-68, ¶¶ 2-7). On one occasion—August 29, 2020, this information indicated that Ombisi went to the Katy Post Office and dropped off a

---

for purposes of clarity in detailing the communications, the Court refers to the messages as being between Russell and AS.

small flat rate parcel at approximately 15:26 while appearing to be on a cellular phone. (*Id*. at PageID 868, ¶¶ 6-7). A review of T-Mobile business records associated with Target iCloud-1, which investigators knew to be subscribed to and used by Ombisi, realized that the telephone call that was taking place at the time Ombisi deposited that package was between him and the telephone number associated with Russell's iCloud Account and that it lasted from 14:28 until 15:39. (*Id*. at PageID 869, ¶ 9).

**II.    Analysis**

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. When presented with an application for a search warrant, the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citation omitted) (explaining that "[s]earch warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny").

"The critical element of a reasonable search is . . . that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978) (internal quotation

marks omitted). This is typically referred to as the "nexus" between the place to be searched and the evidence desired to be found. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2003).

Although reasonable minds may frequently differ on the question of whether the affidavit establishes probable cause, reviewing courts should afford the issuing magistrate's determination "great deference," *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted), "an issuing magistrate's decision should only be reversed if it was arbitrarily exercised," *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)).

To challenge both warrants, Russell relies upon *Riley v. California*, 573 U.S. 373 (2014), which acknowledges the volume of sensitive, private, and distinct types of information stored not only on cellular phones but also by means of "cloud computing." *Id*. at 393-98. Yet the *Riley* court considered warrantless searches of cellular phones, which is not an issue before this Court. Thus, despite its general discussion of the modern usage of cellular phones, *Riley* does not weigh upon the question of whether Affidavits 1 and 2 were supported by probable cause. As this is Ombisi's sole challenge to whether probable cause supported the First Search Warrant, and as the Court does not find that it has merit, it is RECOMMENDED that it did, that the issuing magistrate did not arbitrarily issue it, and that the evidence obtained by the execution of the warrant should not be suppressed.

To challenge the second warrant, Russell argues that the thirty April 6, 2018 text messages between him and AS were outside the scope delineated in the First Search Warrant but were nonetheless included in Affidavit 2. A review of Attachment A to the First Search Warrant shows that Russell is correct, as it sets forth the property to be searched and explicitly states that

it applies to the timeframe beginning on May 1, 2018. (D.E. #90 at PageID 818). The Government appears to concede that the text messages were obtained outside the scope of the First Search Warrant, as it does not argue otherwise. (*See* D.E. #119 at PageID 1828-29).

The Government does assert that, despite the fact that Affidavit 2 contained unlawfully obtained evidence, the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897, 906 (1984) should apply. The good-faith exception states that, if officers were acting in objectively reasonable reliance upon a search warrant that is subsequently invalidated, the exclusionary rule does not apply, and the evidence may be introduced despite any error made by the issuing magistrate. *Id.*; *see also United States v. Laughton*, 409 F.3d 744, 748-49 (6th Cir. 2005); *United States v. Savoca*, 761 F.2d 292, 295-98 (6th Cir. 1985). Yet, here, the Court is not considering an error committed by the issuing magistrate; instead, it is considering an error committed by the law enforcement officers who presented unlawfully obtained evidence to the issuing magistrate. This is precisely the situation for which the exclusionary rule was devised. *See Leon*, 468 U.S. at 916 (stating that "the exclusionary rule is designed to deter police misconduct").

There has been contentious debate within the Sixth Circuit and between other circuits as to whether the *Leon* good-faith exception applies if a warrant includes evidence that was unlawfully obtained in an earlier search. One panel of the Sixth Circuit initially stated in *dicta* that "the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure." *United States v. Davis*, 430 F.3d 345, 358 n.4 (6th Cir. 2005). Only ten days later, another panel of the Sixth Circuit held that, if the Fourth Amendment violation in the underlying search was "'close enough to the line of validity to make the officer's belief in the validity of the [subsequent] warrant objectively reasonable,'" the *Leon* good-faith

exception may still apply to the subsequent search. *United States v. McClain*, 444 F.3d 556, 565-66 (6th Cir. 2005). Rehearing *en banc* was sought in *McClain* but denied over strong dissent. *United States v. McClain*, 444 F.3d 537 (6th Cir. 2006), *cert. denied*, 549 U.S. 1030 (2006). Later panels of the Sixth Circuit determined that they were "bound by *McClain*," which undertook an "exhaustive discussion of the issue," despite the conflicting *dicta* in *Davis*. *See United States v. Tucker*, 742 Fed. Appx. 994, 1003 (6th Cir. 2018); *United States v. Fugate*, 499 Fed. Appx. 514, 518-19 & n. 5 (6th Cir. 2012).

Here, it is not disputed that the April 6, 2018 text messages were obtained beyond the scope of the First Search Warrant. A search outside explicit date parameters cannot be said to be "close enough to the line of validity" for a reasonable officer to believe that a later search warrant based in significant part upon it would be lawful. Thus, this is not one of the "unique cases" that was present in *McClain* where the good-faith exception applies to justify the second search even though it is based upon information obtained in violation of the Fourth Amendment. *See McClain*, 444 F.3d at 565. Accordingly, it is RECOMMENDED that the *Leon* good-faith exception does not prevent the exclusionary rule from applying to the evidence obtained from the second search of Russell's iCloud Account.

Even so, the parties contend that the Court should disregard the thirty April 6, 2018 text messages in Affidavit 2 to determine if probable cause nonetheless existed for the Second Search Warrant to be issued. The *Davis* court directly addressed this issue and held that, even if the application for a search warrant includes illegally obtained evidence, the Court should consider whether probable cause exists with it removed before determining whether suppression of the

evidence is proper. *See* 430 F.3d at 357-58 [7]; *see also United States v. Jenkins*, 396 F.3d 751, 758-59 (citing cases).

Here, if this Court were to disregard the April 6, 2018 evidence in reviewing Affidavit 2, the only new evidence contained therein that pertains to Russell is that he was believed to have been on a phone call with Ombisi while Ombisi deposited a small flat rate parcel at the Katy Post Office and that the parcel was consistent with the packaging he was known to use to distribute counterfeit Adderall. There is no evidence regarding either the nature of the phone call or the contents of the package mailed from the Katy Post Office.

The Sixth Circuit has held that, "in order to undermine the magistrate's finding, the likelihood of an innocent explanation must (at the very least) be *greater* than the likelihood of a guilty one." *United States v. Terry*, 522 F.3d 645, 650 (6th Cir. 2008); *see also United States v. Bryshaun Dodds*, No. 3:18-cr-730, 2021 WL 698657, at *3 (N.D. Ohio Feb. 23, 2021) (reasoning that "[t]he fact that these incidents individually may be susceptible to an innocent explanation does not undermine the . . . court's probable cause determination"). While it is certainly possible that Russell was in touch with Ombisi regarding drug distribution or other criminal activities, with only the evidence set forth in Affidavit 2, the Court believes that the likelihood of an innocent explanation is higher than the likelihood of a guilty one. Thus, it is RECOMMENDED that, even if the unlawfully obtained April 6, 2018 text messages were disregarded, Affidavit 2 fails to set forth probable cause for the search of Russell's iCloud Account.

---

[7]  Although the Sixth Circuit has determined that it is bound by *McClain* rather than *Davis* on the question of whether the good-faith exception may apply despite a warrant containing unlawfully obtained evidence, the *McClain* court did not address the question of whether a reviewing court may uphold a search made pursuant to a warrant that contains unlawfully obtained evidence if the court removes this information and determines that probable cause nonetheless exists. Thus, *Davis* appears to be controlling on this question.

Accordingly, while "suppression is not an automatic consequence of a Fourth Amendment violation," *Hudson v. Michigan*, 547 U.S. 568, 591 (2006), and has always been a "last resort" rather than "first impulse," *Herring v. United States*, 555 U.S. 135, 137 (2009), the conduct here is "sufficiently culpable that such deterrence is worth the price paid by the justice system," *Id*. at 144. Thus, it is RECOMMENDED that the exclusionary rule bars the introduction of any evidence against Russell that was obtained pursuant to the Second Search Warrant.

### III.  Conclusion

For the reasons set forth herein, it is RECOMMENDED that Russell's Motion to Suppress the evidence obtained pursuant to the 20-SW-152 be DENIED and Russell's Motion to Suppress the evidence obtained pursuant to 20-SW-273 be GRANTED.

**SIGNED** this 22nd day of April, 2022.

> s/ Charmiane G. Claxton
> CHARMIANE G. CLAXTON
> UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**